## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 2000-CA-00141-SCT

*DOROTHY ELIZABETH HOLLON*

*v.*

*TIMOTHY P. HOLLON*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/20/1999 |
| TRIAL JUDGE: | HON. PAT H. WATTS, JR. |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | THOMAS L. MUSSELMAN |
| ATTORNEY FOR APPELLEE: | DAVID A. ROBERTS |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | REVERSED AND REMANDED - 05/03/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 5/24/2001 |

**BEFORE PITTMAN, C.J., COBB AND DIAZ, JJ.**

**DIAZ, JUSTICE, FOR THE COURT:**

¶1. This matter arises from a divorce action decided by the Chancery Court of Jackson County, wherein Timothy Paul Hollon (Tim) and Dorothy Elisabeth Hollon (Beth) were granted a divorce on the grounds of irreconcilable differences. The only disputed issues argued before the trial court involved child custody, child support, and the assessment of court costs. The trial began on July 19, 1999, when Tim presented his case-in-chief. Due to a clogged docket, the chancellor recessed court in the middle of the trial, with testimony resuming on August 24, 1999.

¶2. On December 20, 1999, a final judgment nunc pro tunc was entered granting Tim and Beth a divorce. The chancellor also granted Tim custody of Zach, but reserved visitation rights for Beth. The trial court further ordered Beth to pay approximately $200 a month for child support to Tim, and allowed Tim to claim Zach as a dependent on his federal and state income taxes. Beth appeals the chancellor's decision to award custody of their son to Tim, believing that the chancellor erred in the following ways:

> I. THE CHANCELLOR'S FINDINGS OF FACT WERE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE THAT PRIMARY CUSTODY BY TIMOTHY PAUL HOLLON WAS IN THE CHILD'S BEST INTEREST.

> II. THE CHANCELLOR APPLIED AN ERRONEOUS LEGAL STANDARD WHEN HE CONSIDERED AN ALLEGED LESBIAN AFFAIR AS EVIDENCE OF DOROTHY ELISABETH HOLLON'S MORAL UNFITNESS.

### FACTS

¶3. Tim and Beth were married on April 9, 1994, in Jackson, County, Mississippi. During the course of the marriage, Zachary Thomas Hollon was born on July, 16, 1996. In addition to Zach, Tyler Watson, Beth's

child from a previous marriage lived with Tim and Beth. The family resided in Bonaparte Square Apartment complex in Pascagoula, where Beth served as the on-site manager. The apartment complex owners provided Beth and Tim with a rent-free apartment as part of her compensation package. Tim served the City of Moss Point as a police officer.

¶4. Soon after Zach's birth, Tim and Beth's marriage began to deteriorate. They separated in January of 1997, for approximately eight weeks. After reconciling, their marriage again drifted into troubled waters leading to a second separation on January 11, 1998. Tim moved out of the marital apartment and into his parents' home, leaving Zach and Tyler in Beth's care. In an effort to alleviate the financial strain placed upon her during her separation, Beth took in a roommate, Beth Dukes (Dukes). Prior to this arrangement, Bonaparte Square Apartment complex also provided Dukes, an officer with the Pascagoula Police department, with a rent-free apartment in exchange for her service as a "courtesy officer." Dukes performed minimal security duties and fulfilled much of her obligation to the owners by simply serving as a police officer while residing at the apartment complex. Dukes lived with her son, Seth Holder, a child from her previous marriage.

¶5. As roommates, Beth and Dukes split expenses, such as utilities and groceries. In addition, they each served as a baby sitter for the children when one was otherwise occupied. At the time, five people inhabited Beth's three-bedroom apartment; Beth and her two children, Tyler and Zach, as well as Dukes and her son Seth. Tyler, a teenager, was given his own bedroom, while Seth and Zach shared a bedroom as they were both under the age of five. Beth and Dukes shared the third bedroom.

¶6. At trial, Beth freely admitted that she and Dukes slept in the same bed. However, she vehemently denied any sexual relationship existed between her and Dukes, continually characterizing their relationship as platonic. Donna Mauldin, a friend of Beth's, testified that Beth told her that she and Dukes were engaged in a sexual relationship. Mauldin further testified that Beth wanted her to deny, if asked, that she ever admitted having a sexual relationship with Dukes. Mauldin refused to do so.

¶7. During the separation, while Beth and Dukes were sharing the apartment at Bonaparte Square, Tim heard the surfacing allegations surrounding Beth and Dukes' relationship. In order to investigate, Tim borrowed a key to the apartment, his former marital residence, from Donna Mauldin.[1] While Beth and Dukes were away, Tim and Calvin Hutchins entered the apartment without permission and made a photographic record of things Tim felt were "inappropriate." These photographs and rumors led him to become concerned with "the environment that [Zach] would be raised in." Among other things, Tim took photographs of Dukes' clothing and police equipment in the shared bedroom, beer bottles in the refrigerator and wastebasket, liquor bottles on the counter, and one red light bulb in a ceiling fixture. These photographs were admitted into evidence over Beth's objection.

¶8. Tim returned to the apartment a second time, again while Beth and Dukes were absent and without their consent, with his mother and Jim Mauldin to remove certain items he felt belonged to him, including furniture and a television set. Upon her return, Beth noticed several items missing and contacted the police to report a possible burglary. Due to the nature of the missing items, she suspected Tim was the culprit and filed charges against him which were later dismissed.

¶9. Tim and Beth each testified that the other was a good parent and had only Zach's best interests at heart. Both testified that their parents would serve as supplemental care givers to Zach when they were at work or unable to fulfill their parental obligations. Tim admitted that the only problem he had with Beth retaining

permanent custody of Zach was his belief that she engaged in homosexual activity.

¶10. Tim lives with his parents in their four-bedroom house and pays them fifty dollars a month in rent. During the trial, Beth moved out of the apartment complex with her two children and into her parents' five-bedroom house. She initiated this move during the break in the trial because she felt the judge disapproved of her living situation. Beth's plan to reside with her parents is temporary. She and Tyler will move into a newly remodeled three bedroom house provided, in part, by her new job as the rental property manager for R. J. Homes. Beth no longer lives with Dukes and her son, although they remain friends.

## STANDARD OF REVIEW

¶11. Our familiar standard holds that, absent an abuse of discretion, we will uphold the decision of the chancellor. To disturb the factual findings of the chancellor, this Court must determine that the factual findings are manifestly wrong, clearly erroneous or the chancellor abused his discretion. *Jerome v. Stroud,* 689 So. 2d 755, 757 (Miss. 1997). However, where the chancellor improperly considers and applies the *Albright* factors, an appellate court is obliged to find the chancellor in error. *Stroud,* 689 So. 2d at 757 (citing *Smith v. Smith,* 614 So. 2d 394, 397 (Miss.1993)).

## LEGAL ANALYSIS

### I. THE CHANCELLOR'S FINDINGS OF FACT WERE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE THAT PRIMARY CUSTODY BY TIMOTHY PAUL HOLLON WAS IN THE CHILD'S BEST INTEREST.

¶12. The polestar consideration in child custody cases is the best interest and welfare of the child. *Albright v. Albright,* 437 So. 2d 1003, 1005 (Miss. 1983). The *Albright* factors used to determine what is, in fact, in the "best interests" of a child in regard to custody are as follows: 1) age, health and sex of the child; 2) determination of the parent that had the continuity of care prior to the separation; 3) which has the best parenting skills and which has the willingness and capacity to provide primary child care; 4) the employment of the parent and responsibilities of that employment; 5) physical and mental health and age of the parents; 6) emotional ties of parent and child; 7) moral fitness of parents; 8) the home, school and community record of the child; 9) the preference of the child at the age sufficient to express a preference by law; 10) stability of home environment and employment of each parent; and 11) other factors relevant to the parent-child relationship. *Albright,* 437 So. 2d at 1005. It should further be noted that marital fault should not be used as a sanction in custody awards, nor should differences in religion, personal values and lifestyles be the sole basis for custody decisions. *Id.* at 1005.

¶13. In order to determine whether or not the chancellor was manifestly wrong, clearly erroneous or abused his discretion in applying the *Albright* factors, we review the evidence and testimony presented at trial under each factor to ensure his ruling was supported by record.

### 1) *The age, health and sex of the child*

¶14. Although this Court has weakened the "tender years" doctrine in recent years,[2] there is still a presumption that a mother is generally better suited to raise a young child. *Sobieske v. Preslar,* 755 So. 2d 410, 413 (Miss. 2000). Chancellor Watts began his analysis of the case with the statement that the child was barely three years old at the time the trial ended. He pointed out that the tender years doctrine had been weakened and found Zach to be a healthy male child, with no physical or mental impairments who

could be cared for equally well by both parties. The chancellor did not explicitly say that this factor favored one party over another. This factor favors Beth because the legal presumption, although weakened, still favors the mother to raise a very small child.

### 2) *The determination of which parent had continuous care of the child prior to the separation*

¶15. Chancellor Watts was mindful of the fact that since the parties separated, the mother retained primary care of the child, with the father retaining visitation privileges. The chancellor failed to note that Tim did not have custody of Zach during the previous separation, nor express any interest in becoming the custodial parent until the allegations of homosexuality arose. The chancellor did not point out that Tim rarely exercised his visitation rights, nor did he make a specific finding that this favored one parent over the other. Clearly, this factor weighs in favor of Beth.

### 3) *The determination of which parent has the best parenting skills as well as the willingness and capacity to provide primary child care*

¶16. After scrutinizing the evidence presented under this factor, the chancellor found that

> [B]oth parties cared equally for the child prior to their separation, and that both parties are found to have contributed equally to the continuity of care of the child prior to their separation. That both parties participated in feeding, clothing, changing and taking care of the child's needs and wants, and that each cared for the child's everyday needs. There was little testimony as to the parenting skills of the parties, and the Court finds that either party - that neither parties [sic] parenting skills, willingness and capacity to take care of the child, is greater than the other.

This finding is not entirely supported by Tim's testimony and is directly contradicted by Beth's testimony. Tim admitted that he had not paid his child support obligations regularly, forcing Beth to garnish his wages. He also admitted not visiting Zach for approximately two months during the final separation. Beth further testified that Tim failed to pay any child support for Zach for four months during the separation.

¶17. Prior to the separation, Beth testified that she had the primary responsibility of caring for her two children. She estimated that she provided approximately ninety percent of the direct care for Zach, such as changing, feeding, and supervising him, as well as doing laundry and other housework. Beth shared cooking duties with Tim. Tim testified that he helped change and feed Zach, but qualified his testimony adding that he provided said care in the evenings or on his days off. Tim's work schedule prohibits consistent, in depth care of the child.

¶18. The chancellor found that neither parent held an advantage over the other here. From the entirety of the record, it is clear that Beth provided primary child care and if from familiarity or practice alone, holds an advantage over Tim in this area.

### 4) *The employment of the parent and responsibilities of that employment*

¶19. In his analysis of this factor, the chancellor gave a detailed recitation of the employment circumstances of both Beth and Tim. Although he did not cite a preference for either parent in the record, it is obvious that Beth's working situation is far more conducive to caring for a young child. Tim serves the public as a police officer and thus logs eighty-four hours on duty during his two-week shift. The schedule follows a two days on, two days off, three days on, two days off, two days on, three days off pattern with Tim on duty twelve

hours each working day, rotating from a day shift to a night shift every twenty-eight days.

¶20. Beth works approximately thirty-five hours a week as a rental property manager in an office environment. Her position requires her to work only during the day, never on weekends and never during the holidays. This is in stark contrast to the regimented schedule that Tim must adhere to, regardless of weekends, holidays, or the hour of the day. Beth derives supplemental income from a paper route that serves the local naval base and ship yard, which takes about an hour out of each day. She delivers the papers in the morning, often during her scheduled work hours, with the permission of her current employers. Beth also has the option of taking Zach to work with her if she chooses. Without question, this factor weighs heavily in Beth's favor.

### 5) *The physical and mental health and age of the parents*

¶21. Chancellor Watts noted that, at the time of trial, Beth was 36, Tim was 38, and both were in good physical and mental health. Although not specifically stated by the trial judge, this factor balances equally between Beth and Tim.

### 6) *The emotional ties of parent and child*

¶22. Commenting on the emotional ties of Zach to his parents, the trial court held that no testimony was presented that showed Zach exhibited a stronger attachment to one parent over the other. Despite this finding, the trial court noted that Zach has been in Beth's continual care throughout both separations and subsequent divorce proceedings. The trial court implied that this factor also balanced equally between Tim and Beth, again never specifying for the record who, if anyone, benefitted from this factor.

### 7) *The moral fitness of the parents*

¶23. The seventh factor, moral fitness, took the lion's share of the chancellor's attention and is essentially what Beth argues dealt the fatal blow to her attempt to retain custody of Zach. Chancellor Watts noted that neither parent attended church regularly, which was "disturbing to the Court to some degree." The chancellor further stated Beth having a red light bulb in a fixture is "somewhat unusual, but not determinative of the issues herein." It is impossible to understand why the color of a light bulb is mentioned under this heading.

¶24. The chancellor then dove into the allegations of the homosexual affair. Chancellor Watts found Beth's testimony regarding this issue to be untrustworthy. In fact, because Beth's testimony denying her relationship with Dukes directly contradicted Donna Mauldin's testimony confirming it, he asked the District Attorney's office to consider conducting an investigation into whether or not Beth committed perjury by denying she had a homosexual relationship with Dukes. The chancellor further noted that he ought to have confidence that the custodial parent is a truthful, forthright person, and he stated that he lacked that confidence in Beth. Accordingly, he found that this factor weighed heavily in Tim's favor.

¶25. Chancellor Watts also noted that evidence of a homosexual relationship is not, per se, a basis to determine that child custody should be denied.[3] He then went on to rehash, in detail, all of the testimony regarding Beth's alleged sexual relationship with Dukes. This Court has held that:

> In divorce actions, as distinguished from proceedings for modification of custody, sexual misconduct on the part of the wife is not per se grounds for denial of custody. A husband may upon proof of his

wife's adultery be granted an absolute divorce on that grounds and yet in the same case custody of the children may be awarded to the mother. Our cases well recognize that it may be in the best interest of a child to remain with its mother even though she may have been guilty of adultery.

*Cheek v. Ricker,* 431 So. 2d 1139, 1144-45 n.3 (Miss. 1983)(citing *Yates v. Yates,* 284 So. 2d 46, 47 (Miss.1973); *Anderson v. Watkins,* 208 So. 2d 573 (Miss.1968); *Schneegass v. Schneegass*, 194 So.2d 214 (Miss.1966)).

¶26. This view of custody arrangements is comparable to that employed in other states in similar fact situations. *Cheek,* 431 So. 2d at 1145 n. 4 (citing *Roberson v. Roberson*, 370 So. 2d 1008, 1011 (Ala.Civ.App.1979) ("a mother will not be denied custody for every act of indiscretion or immorality", especially where no detrimental effect on the welfare of the child has been shown); *Rippon v. Rippon,* 381 N.E.2d 70, 73 (Ill.App.Ct.1978) ("indulgence in moral indiscretions alone is not grounds for a change of custody where the children are leading a normal life")).

¶27. The trial court never found the mother unfit to care for Zach, and no evidence was presented regarding any detrimental effects the child may have suffered as a result of living with his mother. The chancellor failed to mention that Tim admitted drinking a couple of beers every other day, that he drank to the point of being under the influence in the past, and formerly gambled every other week, but had not gambled recently because he did not have the money to do so. Beth also admitting to drinking to the point of intoxication in the past, but admitted that she gambled only once every six months.

¶28. While this factor is as important as any other and should be given its due consideration, it appears that the allegations offered under this heading were far and away the most scrutinized among the evidence reviewed at trial.

> 8) *The home, school and community record of the child*

> 9) *The preference of the child at an age sufficient to express a preference by law*

¶29. The chancellor noted that no evidence had been presented with regard to these two factors, and therefore did not weigh against either parent.

> 10) *The stability of home environment and employment of each parent*

¶30. The chancellor found, after considering the stability of the home environment and employment of each parent, that this factor favored Tim. This reasoning is inexplicable. Beth's current employment situation, discussed above, is clearly more favorable to child-rearing than Tim's schedule.

¶31. By the time the second day of the trial arrived, both Tim and Beth lived with their parents, although Beth stated her intention to move into a house of her own. The trial court seemed to hold this relocation and change in employment against her, although a less than subtle warning offered by the chancellor was the sole reason that Beth initiated the change in living situations.

¶32. At the end of testimony on the first day of trial, Tim's attorney, David Roberts, asked Chancellor Watts to enter an injunction against allowing any sexual activity in front of Zach. Beth's attorney, Gary Roberts, offered no objection to this arrangement. Tim's attorney then asked the court, since Beth still maintained custody of Zach, to hold specifically that Beth and Dukes sharing the same bed constituted

"sexual activity" and that they therefore be prohibited from doing so until the conclusion of the trial. Beth's attorney objected. The discussion continued as follows:

> BY THE COURT: Well, basically what that means is that they [the children] don't have to standing there looking at it. If this lady here [Beth] is in bed with another lady, and the children are there, then she is going to be in contempt of Court. It's just that simple. I want to be sure we understand that now.

> BY GARY ROBERTS: Well, Your Honor, I certainly would not think, and perhaps I'm mistaken, but I certainly wouldn't think that the Court meant because you're asleep in a bed, that's sexual activity.

> BY THE COURT: Well how - if you sleep in the bed and they say, well, there's not sexual activity?

> BY GARY ROBERTS: Well, I mean, I certainly engage in a lot of sleeping that's not sexual activity, Judge.

> BY THE COURT: What does the law presume, though?

> BY GARY ROBERTS: I certainly don't think that the law presumes, Judge, that because you are in a bed and somebody else is in that bed, that you're engaging in some sort of sexual activity. I don't think that's the -

> BY THE COURT: I think the law says if you have an adulterous inclination and an opportunity to carry it out, then that, in effect, can be grounds for adultery. Now, I'm not saying that we have charges for adultery here. I'm trying to make an analogous situation.

> Also, one of the things in the back of my mind is, if I do not do that, then I can see how these parties are going to react to what has happened today, in reference to what I may do in the future. And sometimes, it's better just to let them act out their parts, whatever it's going to be, and then rather than order them to do something, and then that be the basis of the reason that they do it. I think what I'm going to do is, before I enter an Order like that, I want to hear from both sides. I think that's what I'm going to do. I'm not going to do that injunction at this time. I'm going to wait and hear from both sides before I do that.

The chancellor did not enter the aforementioned order and left Zach in Beth's custody. The above quoted exchange can hardly be read as anything other than a veiled threat to Beth.

¶33. After hearing the previous exchange, on advice of counsel, Beth rearranged her living situation during the break in the trial. This change necessarily affected her job, so she immediately found another job, with comparable benefits. Beth moved home with her parents, making her living situation equivalent to Tim's. The trial court noted this move and penalized her for being "unstable" in her employment and living situation. The chancellor effectively penalized her for responding to his threat, exhibiting classic *Catch-22* logic.

   11) *Other factors relevant to the parent-child relationship*

¶34. Under this heading, the trial judge noted that the pictures submitted as evidence portrayed a messy house with empty beer bottles on the counter. The court acknowledged that Tim admitted taking clothes out of the closet and rearranging them in the bedroom to take the picture, and that drinking is "done almost

everyday by everyone." Again, no reference was made to Tim's admitted drinking.

¶35. After considering all of the evidence and weighing the enumerated factors, the trial judge found that it would be in the best interest of the child to be relocated to Tim's care. A cursory glance at the above analysis reveals that the evidence supports a finding that more factors weigh in favor of Beth than Tim. The chancellor found otherwise. While the chancellor did cover each *Albright* factor, he rarely did anything but restate some of the pertinent evidence to be considered under each factor, only once or twice actually ruling that a factor favored one party over the other.

¶36. This Court has held that although it could not be said that the chancellor's conclusion regarding the application of the *Albright* factors was so lacking in evidentiary support as to be manifest error, the absence of specific findings prevented affirming the lower court with the confidence that the best result was reached. *Hayes v. Rounds,* 658 So. 2d 863, 865 (Miss.1995). A similar situation presents itself today. While the chancellor analyzed the applicable factors, he did not do so with specificity, assigning very few to a particular parent. If, as *Albright* indicates, one factor should not outweigh another, the chancellor erred by determining the case on the basis of Beth's moral fitness, when upon review, Beth clearly wound up with more factors weighing in her favor. *Albright,* 437 So. 2d at 1005.

¶37. Tim testified that his only concern with leaving Zach in Beth's permanent custody was the "homosexual environment" in which Zach would be raised. Tim felt that she was qualified in every other way to raise the child. Tim specifically testified that "[i]t's wrong, it's - and I don't care what society says. It's morally wrong. It totally goes against the laws of God. It is wrong, period. I want my son to grow up a healthy, happy, young man." Despite this admonition, he testified that Beth was a good mother. It is clear from the record that the chancellor's defining consideration in determining custody of Zach centered on the allegations of Beth's homosexual affair. In doing so, the chancellor committed reversible error.

> II. THE CHANCELLOR APPLIED AN ERRONEOUS LEGAL STANDARD WHEN HE CONSIDERED AN ALLEGED LESBIAN AFFAIR AS EVIDENCE OF DOROTHY ELISABETH HOLLON'S MORAL UNFITNESS.

¶38. This argument is little more than a rehash of the points presented under the "moral fitness" section of the *Albright* factors. Beth simply attempts to argue that the chancellor applied an erroneous legal standard by considering the allegations of a lesbian relationship in granting Tim custody of Zach. More properly, this argument should be labeled an inappropriate application of the correct legal standard by the chancellor in placing too much weight on one particular factor, i.e., moral fitness. This argument is adequately addressed under Issue I.

## CONCLUSION

¶39. Within his analysis of the *Albright* factors, the chancellor abused his discretion by placing too much weight upon the "moral fitness" factor and ignoring the voluminous evidence presented under the remaining factors supporting Beth as the preferred custodial parent. Therefore, we reverse the decision of the Chancery Court of Jackson County and award Beth custody of Zach and remand the case for a determination of Tim's visitation rights and further proceedings not inconsistent with the dictates of this opinion.

¶40. **REVERSED AND REMANDED.**

**PITTMAN, C.J., CONCURS. BANKS, P.J. AND COBB, J., CONCUR IN PART AND IN THE RESULT. SMITH, J., CONCURS IN RESULT ONLY. WALLER, J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY BANKS, P.J., SMITH AND COBB, JJ. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY MILLS AND EASLEY, JJ.**

**WALLER, JUSTICE, CONCURRING:**

¶41. While I concur with the disposition reached in the majority opinion, I disagree with what is characterized as too much weight upon the "moral fitness" factor. Without question the living arrangement of Beth Hollon ("Beth") and Beth Dukes was inappropriate and questionable at best. However, Beth made a positive change in her physical living arrangements first by terminating the untenable living arrangements with Dukes and then by planning a move to the newly-remodeled three bedroom house.

¶42. When these changes are taken into consideration, the *Albright* factors weigh overwhelmingly in Beth's favor, particularly in the following respects:

(1) Age of child. The child had just turned three.

(2) Continuous care of child. The child had always been in Beth's care while Tim, the father, had been gone for periods of time without even exercising visitation. Tim was irregular in fulfilling his support obligations.

(3) Parenting skills. There was no dispute that Beth had been the primary caregiver and had performed this duty well.

(4) Employment of the parent. There is no contest here. Beth's schedule was regular and Tim's schedule could be characterized as chaotic for a family.

(10) Stability of home. Beth demonstrated a clear desire to stabilize her family's living situation with the move to the remodeled home. Tim's parents would essentially become surrogate parents because of Tim's work situation.

¶43. Based on the record and the Chancellor's own enumeration of the *Albright* factors, it is clear that the Chancellor abused his discretion in awarding custody to Tim Hollon, and I would reverse and remand. I agree with the Chancellor's concerns about Beth's moral fitness, but the changed living arrangements, along with Tim's almost total failure to be involved in the child's life, do not warrant a change of custody.

**BANKS, P.J., SMITH AND COBB, JJ., JOIN THIS OPINION.**

**McRAE, PRESIDING JUSTICE, DISSENTING:**

¶44. The majority states that the Chancellor erred by placing too much weight upon the mother's moral fitness, i.e., her alleged homosexual affair, when reviewing the situation in light of the other *Albright* factors. The majority emphasizes that Beth Hollon should not be denied custody of Zach simply because she was allegedly having an adulterous affair. However, the key factors in this matter are the trustworthiness and honesty of Beth and whether the facts that point to her dishonest behavior, such as encouraging her friend to perjure herself, coupled with Beth's adulterous affair by living and sleeping with her paramour for a period

of time with her children in the household, played a significant factor in the Chancellor's decision. Finding that the Chancellor did properly weigh Beth's behavior as to the witness, Donna Mauldin, I would affirm the judgment of the Chancellor. For these reasons, I dissent.

¶45. In domestic relations, our scope of review is limited by the familiar substantial evidence/manifest error rule. *Heigle v. Heigle*, 771 So. 2d 341, 344 (Miss. 2000) (citing *Stevison v. Wood*, 560 So. 2d 176, 180 (Miss. 1990)). We do not reverse a Chancellor's ruling unless it appears that the Chancellor was manifestly wrong or clearly erroneous or an erroneous legal standard was applied. *Bell v. Parker*, 563 So. 2d 594, 596-97 (Miss. 1990). This standard especially holds true in cases of divorce, alimony, and child support. *Heigle*, 771 So. 2d at 344 (citing *Tilley v. Tilley*, 610 So. 2d 348, 351 (Miss. 1992); *Nichols v. Tedder*, 547 So. 2d 766, 781 (Miss. 1989)).

¶46. During testimony presented to the Chancellor, Beth denied the affair with Dukes. Yet Maudlin, a long-time friend since the tenth grade, testified that Beth admitted having an affair with Dukes. She further testified that the two lived together, slept in the same bed, and often embraced and kissed. According to Maudlin, Beth had stated that she was sexually satisfied with Dukes and that her sexual experience with Dukes would "make you see God and talk to Jesus." Maudlin also testified that Beth had asked her to deny these allegations when testifying. The Chancellor found this situation to be "disturbing" and even stated that he intended to report this matter to the District Attorney's office for further investigation as to whether Beth had committed perjury. The Chancellor recognized his duty to weigh all the *Albright* factors by stating,

> The Court, of course, notes that the moral fitness of one of the parties is but one factor to be considered in determining the best interest of the child. In order for the Court to feel comfortable with the decision as to who should have permanent custody, it should have confidence in the person from whom it receives testimony concerning who should receive custody. That person should be truthful and forthright with the Court. The Court does not have a feeling of confidence or a feeling of reliability in the truthfulness and forthrightness of the wife.

¶47. It is clear that the Chancellor was aware of the other *Albright* factors and the equal weight he should give to each. Beth brought this adulterous affair into her home, where Zach was in her custody, and openly shared a bedroom with Dukes. The fact that Beth committed adultery in her child's home did not create a healthy environment for Zach, and this characteristic also is detrimental to Beth's moral fitness as a parent.

¶48. The Chancellor further found that Tim Hollon had a more stable environment within which to raise Zach. Tim had moved to his parents' home after the final separation with Beth. His parents had a four-bedroom home in an area that was close to a school and in a neighborhood with children with whom Zach could play. Beth testified that she moved from her apartment at the Bonaparte apartment complex to live temporarily with her parents and that then she would subsequently move to another house. Tim was already settled and established living with his parents. The Chancellor correctly found that Tim could provide a more stable living environment for Zach.

¶49. Both Tim and Beth testified that each was an able and qualified parent, responsible to care adequately for the child. It does not appear that the Chancellor gave the testimony as to the moral fitness of the parents more weight than any of the other factors. On the contrary, the alleged behavior of Beth provided a glaring mark upon her credibility, truthfulness, and morality. The alleged affair and perjury clearly do not favor Beth, and this made the weight of the evidence favor Tim. The evidence supports the Chancellor's ruling and that it was not manifestly wrong nor clearly erroneous.

¶50. For these reasons, I dissent.

**MILLS AND EASLEY, JJ., JOIN THIS OPINION.**

1. It is unclear from the record how Donna Mauldin obtained possession of a key to Beth's apartment, much less why she then gave it to Tim.

2. The prominence of the "tender years" doctrine has been tempered, but not abrogated by this Court. In *Buntyn v. Smallwood*, 412 So. 2d 236, 238 (Miss.1982) this Court noted that if the mother of a child of tender years is fit, then she should have custody. However, this Court modified that view in *Albright v. Albright,* 437 So. 2d 1003 (Miss.1983) when the "tender years" doctrine was characterized as a factor worthy of weight in determining the best interest of a child. *See also* ***Pellegrin v. Pellegrin,*** 478 So. 2d 306, 307 (Miss. 1985).

3. This Court has held that it is of no consequence that a mother was having an affair with a woman rather than a man. ***Plaxico v. Michael,*** 735 So. 2d 1036, 1039-40 (Miss. 1999).